NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| THOMAS D. ROSSO, *et al.*, | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | **OPINION** |
| v. | Civil Action No. 07-CV-5845 (DMC) |
| DAIMLER CHRYSLER CORPORATION, *et al.*, |  |
| Defendants. |  |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon Defendant Daimler Chrysler Corporation's ("Chrysler") motion for summary judgment pursuant to FED. R. CIV. P. 56. Oral argument was heard on January 17, 2008 regarding a preliminary injunction. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Chrysler's motion for summary judgment is **granted**.

I.   **BACKGROUND**[1]

Plaintiffs Thomas D. Rosso and Gail M. Rosso ("Plaintiffs") initiated this litigation seeking reinstatement in the Professional-Administrative Management Health Care Program (the "Plan") with Chrysler. The matter has been removed to this Court on Federal Question Jurisdiction based on the Employee Retirement Income Security Act ("ERISA"). Plaintiffs are

---

[1] Chysler's motion for summary judgment pursuant to FED. R. CIV. P. 56 was unopposed by Plaintiffs.

asking this Court to grant temporary injunctive relief during the course of this litigation. Plaintiffs' motion is improper under ERISA and the Federal Rules of Civil Procedure and, therefore, must be **denied**.

      A.      <u>Thomas Rosso's Employment Status</u>

Plaintiffs claim that Mr. Rosso was a laid-off employee from Chrysler since March 2002, when he was cleared to return to work, but no positions were available to him. Mr. Rosso, however, has not applied for, nor is he receiving, Permanent Total Disability Benefits under any of the Chrysler LLC Plans. Mr. Rosso also alleges that he received health care benefits through Chrysler from January 14, 1999 through May 31, 2007. Plaintiffs also acknowledge that the health care benefits were terminated as of March 31, 2004 due to their failure to pay their portion of the premium payments for the coverage on a timely basis. Mr. Rosso also acknowledges that he did not send a payment for April 2004 to cover his share of the benefits. Chrysler, however, made an exception for Plaintiffs in 2004, reinstated the coverage, but told the Rossos that they would no longer make exceptions if premium payments were not made on a timely basis. Then, in June 2007, Mr. Rosso again failed to remit payment for these benefits. He then sought reinstatement of these benefits through Chrysler LLC. At that time, while Chrysler LLC employees were reviewing Plaintiffs' reinstatement request, Chrysler LLC realized that Plaintiffs were no longer eligible to receive benefits under the Plan and those benefits should have been cancelled as of May 31, 2004. This was based upon an interpretation of the Plan document. Plaintiffs acknowledge late payments for April, May and June of 2007. Thus, the late payment was reimbursed by a check dated August 27, 2007 and the coverage was not reinstated.

Since June 1, 2004, Plaintiffs have received $70,528.23 in health care benefits for which Defendant claims they were not entitled.

B.     The Plan's Language

The Plan lays-out the eligibility provisions and coverage issues:

> **Who is Eligible for Coverage**
> You will be eligible for Corporation provided health care coverage, subject to the terms and conditions contained herein, if you are:
> • An active salaries non-represented employee classified under one of the following group designations:
>   ▸ Professional-Administrative roll,
>   ▸ Management roll, or
>   ▸ Executive roll.
>
> **Your Eligible Dependents**
> If you are eligible, the following individuals may also be eligible for Corporation provided health care coverage:
> • Your spouse

See Exhibit B, p.8. Mr. Rosso has admitted in his Compliant that he was no longer an active salaried non-represented employee after his injury on January 14, 1999. Mr. Rosso claims that he was cleared to return to work in March 2002, but Chrysler was not able to provide him with employment at that time. Thus, since Mr. Rosso was no longer an "active salaried non-represented employee," he must find another basis upon which he would be eligible for health care coverage under the Plan. The Plan also provides information regarding "when coverage starts and stops." See Exhibit B, pp. 11-17. As of March 2002, when Mr. Rosso alleges that he was cleared to return to work, he became a laid-off employee. The coverage provisions under the Plan provides:

> **If You Are Laid Off**
> All coverage except dental continues for up to 13 months (25 months if you have 10 or more years of corporate service).
> After the last month for which the Corporation provides coverage, you may continue HSMDVH coverage for a period of 12 additional months by paying the required monthly premium amount for such coverage.

See Plan, Exhibit B, p. 13. The HSMDVH is defined in the Plan at p. 4:

> Generally the Plan consists of various health care coverage options that cover the following types of services:
> • Hospital/Surgical Medical (HSM) care (physician and hospital services, and other general medical services);
> • Prescription drugs (D);
> • Hearing aid and exam (H);
> • Vision (V) care (for routine eye exams, glasses, or contact lenses); and
> • Dental (D) care (for services relating to your teeth and gums).

See Plan, Exhibit B, p.4. Finally, under the Plan, Chrysler has the "sole and absolute discretionary authority to interpret and to make determinations with regard to the terms, conditions or administration of the Plan." Plan, Exhibit B, p. 71.

After one year of disability, on February 9, 2000, Mr. Rosso was sent a loss of coverage notice with COBRA language. Pursuant to the terms of the Plan, Mr. Rosso would have been informed that his coverage end date would have been April 7, 2013, as a disabled employee. At that time, Mr. Rosso was provided two options: (1) to extend company provided health care with lower premiums through April 7, 2013; or (2) COBRA coverage for 36 months until February 9, 2003. If he elected COBRA, he would have eliminated continuation coverage pursuant to the Plan.

When Mr. Rosso was able to return to work, and no work was available, the lay-off continuation of coverage provision of the Plan went into effect. Thus, under the terms of the

Plan, from March 1, 2002, Mr. Rosso was eligible for continuation of health care benefits pursuant to the Plan for twenty-five months since he had ten or more years of corporate service. After twenty-five months, Mr. Rosso was eligible for an additional twelve months of health care coverage pursuant to the Plan if he paid the required monthly premium. He was, therefore, eligible for thirty-seven months of coverage after March 1, 2002. Thus, on May 31, 2005, he was no longer eligible for benefits pursuant to the terms of the Plan.

Chrysler's computers recognized this process and, at the end of the twenty-fifth month, March 31, 2004, Plaintiffs' benefits were terminated. Pursuant to the Plan, however, Mr. Rosso was entitled to receive an additional twelve months of coverage if he paid the required premium. Accordingly, the Rossos were reinstated in the Plan, for what should have been a twelve month period. The system, however, did not terminate the coverage in 2005, so Plaintiffs continued to receive health care benefits – for which they were ineligible – from April 1, 2005 through May 31, 2007. Chrysler became aware of the mistake when Mr. Rosso again missed a required payment pursuant to the Plan's terms.

The Plan is replete with admonitions to participants that, if required monthly premium payments are not received on a timely basis, all coverage will terminate on the final day of the month for which the last monthly amount was applied and the coverage "will not be reinstated even if payment is received later." Plan, Exhibit B, pp. 10-11.

Plaintiffs argue that pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), they were eligible for extended coverage, since Mr. Rosso's Corporation coverage was lost because of a "termination of employment or reduction of hours." Plan, Exhibit B, p. 16. The Rossos were given the required COBRA notice in 2000 and rejected that coverage.

The premiums for converting coverage to COBRA are set at one hundred and two percent of premiums based on an applicable formula. For Mr. Rosso, the COBRA rate for extension of coverage would have been between $754.96 and $898.33 per month. Instead, the Rossos received a significant discount, paying a range between $43.50 and $101.33 per month between April 1, 2005 and May 31, 2007. Plaintiffs would have only been eligible for COBRA coverage through November 2006 (twenty-five months of coverage under the Plan, an extension of twelve months with Plaintiffs' payment and eighteen months under COBRA for a total of fifty-five months). Instead, Plaintiffs secured sixty-one months of coverage at a discounted rate. Pursuant to the express terms of the Plan, Plaintiffs were no longer eligible to receive benefits after November 30, 2006, yet they continued to receive benefits until May 31, 2007. Then, by failing to make a payment on a timely basis, the Chrysler system terminated the benefits and then recognized that the benefits could not be reinstated because of the inappropriate extension of coverage to Plaintiffs. Mr. Rosso acknowledges that he was informed that his appeal was denied.

## II. STANDARD OF REVIEW

### A. FED. R. CIV. P. 12(b)(6): Motion to Dismiss

In deciding a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. See Warth v. Seldin, 422 U.S. 490, 501 (1975); Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure to state a claim. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). In Bell Atl. Corp. v. Twombly, the Supreme Court clarified the FED. R. CIV. P. 12(b)(6) standard. See 127 S.Ct. 1955 (2007). Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." Bell Atl. Corp., 127 S.Ct. at 1968 (citing Conley, 355 U.S. at 45-46). Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp., 127 S.Ct. at 1965.

### B. FED. R. CIV. P. 56: Summary Judgment

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). The moving party bears the burden of

showing that there is no genuine issue of fact. See id. "The burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. See FED. R. CIV. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). However, "[i]n determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the nonmoving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. Appx. 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

**III.   DISCUSSION**

    A.   ERISA

Congress adopted ERISA to create Federal parameters for Employee Benefits Law. See Metro. Life Ins. Co. v. Mass., 471 U.S. 724, 732 (1985). The Civil Enforcement Provisions of ERISA § 502(a) are "the exclusive vehicle for actions by ERISA-Plan Participants and Beneficiaries asserting improper processing of a claim for benefits, and that varying state causes of action for claims within the scope of § 502(a) would pose an obstacle to the purposes and

objectives of Congress." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 52 (1987). Courts have made it clear that the remedies under ERISA are clearly established by Congress and federal courts will not seek to expand the remedies afforded under ERISA. Here, Plaintiffs seek reinstatement in the Plan and payment of medical bills. These are claims upon the Plan language and must be brought pursuant to ERISA 29 U.S.C. § 1132(a)(1)(B). Equitable relief was not available under ERISA 29 U.S.C. § 1132(a)(1)(B).

The only provisions of ERISA that allow for equitable relief are found in 29 U.S.C. § 1132(a)(2), for breach of fiduciary duty claims. The Supreme Court of the United States has made it clear that a party who is seeking equitable relief under these provisions of the statute can only seek equitable relief that "inures to the benefit of the Plan as a whole." Mass. Life Ins. Co. v. Russell, 473 U.S. 134, 140 (1985). As the Supreme Court stated in Mass. Life Ins. Co., "the entire text of Section 409 persuades us that Congress did not intend that section to authorize any relief except for the Plan itself." Id. at 144.

A request for monetary relief, such as the payment of medical bills, is not an equitable remedy. See Great West Life & Annuity Ins. v. Knudson, 534 U.S. 204 (2002).

> Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the Defendant to pay a sum of money to the Plaintiff are suits for 'monetary damages,' as that phrase has traditionally been applied, since they seek no more then compensation for loss relating from the Defendant's breach of legal duty. And money damages are, of course, the classic form of legal relief.

Great West Life & Annuity Ins., 534 U.S. at 712-13 (internal citations omitted). Under the Federal Rules of Civil Procedure, a party cannot seek injunctive relief when it is making a claim for monetary damages. Unlike ERISA, however, Plaintiffs cannot even make this claim for

9

equitable relief. Thus, this request for a preliminary injunction must be rejected.

  B.  The Plan

  Plaintiffs have exhausted all of their eligibility for benefits under the Plan's terms. They have received better coverage than they would have received pursuant to the Plan documents. During the twenty-six months between the time that their thirty-seven months of benefits had terminated and May 31, 2007, the premiums paid by Plaintiffs were significantly less than they would have paid pursuant to COBRA. Under the express terms of the Plan, Plaintiffs have now exhausted all potential coverage pursuant to the Plan and they are not entitled to reinstatement.

  Furthermore, Plaintiffs have acknowledged that they did not always make timely premium payments. The Plan clearly states that a failure to make a payment on a timely basis terminates the coverage and it cannot be reinstated. Plaintiffs have acknowledged that they failed to make payments on a timely basis, which triggered the investigation that determined that they had exhausted all eligibility pursuant to the Plan documents and they were no longer eligible to receive further benefits.

  The Supreme Court, in Firestone Tire & Rubber Co. v. Bruch, established that federal courts, in reviewing ERISA claims, must defer to the determinations of the Plan Administrator if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan." 49 U.S. 101, 115 (1989). A grant of broad discretionary authority furthers ERISA's goals, which are to allow Plan Administrators to make determinations and only reverse those determinations if they are arbitrary and capricious. See id. Here, the Plan grants broad discretionary authority to Chrysler, the Plan Administrator, to

determine eligibility for the benefits or to construe the terms of the Plan. Thus, in determining the likelihood of success on the merits, this Court considers that Chrysler's interpretation of the eligibility issue will be affirmed because it was not arbitrary and capricious.

    C.       Equitable Estoppel

Plaintiff also relies on Nat'l Cos. Health Benefit Plan v. St. Joseph's Hosp. of Atlanta, Inc. to stand for the proposition that claims that equitable estoppel has been applied in ERISA litigation matters and cites. See 929 F.2d 1558 (11th Cir. 1991). Plaintiffs' reliance upon this case is inappropriate.

In Nat'l Cos. Health Benefit Plan, the issue raised concerned the application of equitable estoppel principles to a situation in which the participant was relying upon an interpretation of ambiguous plan language by the Plan Administrator. This issue has not been raised in this matter. In fact, Plaintiff has failed to provide this Court any Plan language. Thus, Plaintiffs cannot rely upon any assertion of "ambiguous" Plan language in support of this claim.

The Supreme Court has questioned whether equitable estoppel principles can apply, in any scenario, when the individuals can make a claim pursuant to the Plan for benefits. In Varity Corp. v. Howe, the Supreme Court completed this analysis. See 516 U.S. 49 (1996). Varity Corp. involved a devious plan by Massey-Ferguson to transfer a significant number of employees and retirees to a corporation that it had created, called Massey Combines Corporation. See id. at 493. While Massey-Ferguson made grand representations about the tremendous upside potential of Massey Combines Corporation, it failed to disclose to the employees and retirees who were being transferred to this entity that Massey Combines Corporation was being set-up to fail. In fact,

11

Massey Combines was "insolvent from the day of its creation" and it had a forty-six million dollar negative net worth on the date that it was created. See Varity Corp., 516 U.S. at 494.

After Massey Combines Corporation failed, the former Massey-Ferguson employees and retirees filed suit in federal court seeking redress of their claims pursuant to ERISA. The employees were seeking reinstatement into the Massey-Ferguson benefit plans and not the Massey Combines Corporation benefit plans. They brought the claims based on estoppel theories for alleged misrepresentation by Massey Ferguson employees that were designed to encourage these individuals to voluntary transfer to the Massey Combines Corporation venture.

The Supreme Court held that an estoppel claim was a viable claim under ERISA only under the narrow circumstances established in Varity Corp. Those circumstances were egregious, written misrepresentations that were known to be false at the time in which they were made. The Supreme Court noted that this type of claim was permitted only if the injured party did not have a claim pursuant to the Plan language.

In Varity Corp., the employees that had been transferred from Massey Ferguson to Massey Combines were no longer "participants" in the Massey Ferguson plans. Therefore, they did not qualify as a party that could bring a lawsuit "pursuant to the terms of the plan," since they were not "participants," which is required by ERISA § 502(a)(1)(B). See Varity Corp., 516 U.S. at 515. The only claims that these individuals could bring were estoppel claims under ERISA § 502(a)(3); 29 U.S.C. § 1132 (a)(3).

The Supreme Court recognized, however, that unfettered use of equitable theories as a basis for ERISA claims created potential problems for ERISA enforcement in the future. The Court, therefore, questioned any use of these theories when a party had the potential of bringing a claim pursuant to the plan language under ERISA § 502(a)(1)(B).

> [T]he statute authorizes "appropriate" equitable relief. We should expect that courts, in fashioning "appropriate" equitable relief, will keep in mind the "special nature and purpose of employee benefit plans," and will respect the "policy choices reflected in the inclusion of certain remedies and the exclusion of others." Thus, we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."
> But that is not the case here. The plaintiffs in this case could not proceed under the first subsection because they were no longer members of the Massey-Ferguson plan and, therefore, had no "benefits due [them] under the terms of [the] plan." § 502(a)(1)(B). They could not proceed under the second subsection because that provision, tied to § 409, does not provide a remedy for individual beneficiaries. They must rely on the third subsection or they have no remedy at all. We are not aware of any ERISA-related purpose that denial of a remedy would serve. Rather, we believe that granting a remedy is consistent with the literal language of the statute, the Act's purposes, and pre-existing trust law.

Varity Corp., 516 U.S. at 515 (internal citations omitted).

Plaintiffs claim that they are participants. Thus, they are making a claim pursuant to ERISA § 502(a)(1)(B). Plaintiffs specifically claim that they are bringing this lawsuit pursuant to ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B). Therefore, under Varity Corp., Plaintiffs do not have an equitable estoppel claim.

      D.    <u>Count Three of the Complaint Fails to State a Claim Upon Which Releif May be Granted</u>

A simple review of the Plan document makes it clear that there is no life insurance or pension benefit available pursuant to the term of the Plan. Plaintiffs have specifically defined the "health Benefit Plan" as being healthcare benefits provided through the "Aetna US Healthcare Division of Aetna, Inc." The Plan document clearly does not allow for the benefits sought by Plaintiffs in this Count. Thus, seeking information from the Plan relating to benefits that are not provided under the Plan cannot be the basis upon which this claim can be sustained. Count III must, therefore, be dismissed as pled because there is no basis for seeking these benefits pursuant to the Plan.

**IV.**    <u>CONCLUSION</u>

For the reasons stated, it is the finding of this Court that Chrysler's motion for summary judgment is **granted**. An appropriate Order accompanies this Opinion.

        S/ Dennis M.Cavanaugh
        Dennis M. Cavanaugh, U.S.D.J.

Date:      May   16 , 2008
Orig.:     Clerk
cc:       All Counsel of Record
          Hon. Mark Falk, U.S.M.J.
          File